**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNAL REVENUE SERVICE,<br><br>Defendant. | Case No.: 4:26-cv-40246 |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF NTEU'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Federal Sector Labor Law ..... 2

II. The NTEU-IRS CBA ..... 2

III. The Exclusions Order ..... 3

IV. OPM Guidance on the Exclusions Order ..... 3

V. IRS CBA Termination ..... 5

VI. Harm to NTEU ..... 7

ARGUMENT ..... 9

I. NTEU Is Likely to Succeed on the Merits. ..... 9

A. The IRS's CBA Termination Is a Final, Reviewable Agency Action. ..... 9

B. The IRS's CBA Termination Was Arbitrary and Capricious. ..... 13

1. The IRS's Mere Duplication of OPM's Boilerplate Termination Notice Does Not Constitute Reasoned Decisionmaking. ..... 14

2. The IRS Failed to Consider NTEU's and Its Members' Reliance Interests. ..... 16

3. The IRS Failed to Consider Alternatives to Immediate Termination. ..... 17

II. NTEU Will Suffer Irreparable Harm Without Preliminary Relief. ..... 18

III. The Balance of Equities Tips in NTEU's Favor, and Preliminary Relief Will Serve the Public Interest. ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Cases**

*AFGE Loc. 2305 v. U.S. Dep't of Veterans Affs.*,
No. 25-cv-583, 2026 U.S. Dist. LEXIS 52266 (D.R.I. Mar. 13, 2026) .......................... 9, 19, 20

*AFGE v. Trump*,
No. 25-4014 (9th Cir. Aug. 14, 2025) .......................... 4

*Airport Impact Relief, Inc. v. Wykle*,
192 F.3d 197 (1st Cir. 1999) .......................... 15

*Am. Hosp. Ass'n v. Kennedy*,
164 F.4th 28 (1st Cir. 2026) .......................... 13

*Amerijet Int'l Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .......................... 14

*Asseo v. Centro Medico Del Turabo, Inc.*,
900 F.2d 445 (1st Cir. 1990) .......................... 19

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................... 9

*Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.*,
333 U.S. 103 (1948) .......................... 9

*Cnty. of Westchester v. HUD*,
778 F.3d 412 (2d Cir. 2015) .......................... 12

*Dep't of Comm. v. New York*,
588 U.S. 752 (2019) .......................... 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......................... 12

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995) .......................... 14

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......................... 13

*FCC v. Prometheus Radio Project*,
592 U. S. 414 (2021) .......................... 13

*Hist. Bridge Found. v. Buttigieg*,
22 F.4th 275 (1st Cir. 2022) .......................... 15

*Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*,
426 F.2d 1243 (D.C. Cir. 1970) ........ 18

*Marasco & Nesselbush, LLP v. Collins*,
6 F.4th 150 (1st Cir. 2021) ........ 12

*Massachusetts v. Dep't of Educ.*,
828 F. Supp. 3d 198 (D. Mass. 2026) ........ 17

*Nat'l Council of Prison Locs. v. Fed. Bur. of Prisons*,
No. 3:25-CV-1907, 2026 U.S. Dist. LEXIS 222823 (D.Conn. Sept. 29, 2026) ....... 9, 10, 12, 13

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ........ 17

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ........ 9

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 20

*NTEU v. Trump, et al.*,
No. 25-935 (D.D.C. Mar. 31, 2025) ........ 3

*Ohio v. EPA*,
603 U.S. 279 (2024) ........ 13

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,
400 U.S. 62 (1970) ........ 9

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
699 F.3d 1 (1st Cir. 2012) ........ 20

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ........ 20

*Small v. Avanti Health Sys., LLC*,
661 F.3d 1180 (9th Cir. 2011) ........ 19

*Thrivent Fin. for Lutherans v. SEC*,
183 F.4th 777 (D.C. Cir. 2026) ........ 14

*U.S. Dep't of Treasury v. NTEU Ch. 73*,
783 F. Supp. 3d 991 (E.D. Ky. 2025) ........ 11

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) ........ 12

*Whitehouse v. Raytheon Co.*,
672 F. Supp. 2d 174 (D. Mass. 2009) ........................................ 14

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................ 9

**Statutes**

5 U.S.C. § 701 ........................................ 9, 12

5 U.S.C. § 704 ........................................ 9

5 U.S.C. § 706 ........................................ 13

5 U.S.C. § 7101(a) ........................................ 2, 20

5 U.S.C. § 7102 ........................................ 2

5 U.S.C. § 7103(b) ........................................ 3

5 U.S.C. § 7111(a) ........................................ 2

5 U.S.C. § 7114(a)(1) ........................................ 2

Federal Service Labor-Management Relations Statute, 5 U.S.C. Ch. 71 ........................................ 2

**Other Authorities**

Executive Order 14,251, *Exclusions From Federal Labor-Management Programs*, 90 Fed. Reg. 14,553 (Mar. 27, 2025) ........................................ passim

Memorandum from Charles Ezell, OPM Acting Dir., to Heads and Acting Heads of Departments and Agencies, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* (Mar. 27, 2025), https://perma.cc/H5SN-T5FZ ........................................ 3–4, 10

Memorandum from Scott Kupor, Dir., OPM, to Heads of Departments and Agencies, *Implementation of Executive Orders 14251 and 14343* (Feb. 12, 2026, rev. Feb. 17, 2026), https://perma.cc/9X9S-PXB4 ........................................ 4, 11, 17

OPM, *Frequently Asked Questions* (Feb. 12, 2026, rev. Feb. 17, 2026) https://perma.cc/9ZQQ-CHWW ........................................ 4, 11

OPM, *Frequently Asked Questions* (rev. Aug. 13, 2025) ........................................ 4, 11

OPM, *Frequently Asked Questions, Executive Order 14251: "Exclusions from Federal Labor-Management Relations Programs"* (Apr. 22, 2025), https://perma.cc/38KJ-Z7TN ........................................ 4, 10

William Wan & Hannah Natanson*, White House Officials Wanted To Put Federal Workers 'In Trauma.' It's Working*., Wash. Post (May 20, 2025), www.washingtonpost.com/ investigations/2025/05/20/ federal-workers-trump-mental-health/ ........................................ 19

## INTRODUCTION

The last two years have been devastating for federal-sector unions and for the National Treasury Employees Union (NTEU) in particular. On March 27, 2025, President Trump issued Executive Order 14,251, *Exclusions From Federal Labor-Management Relations Programs*. Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025) (Exclusions Order or Order). The Order stripped collective-bargaining rights from hundreds of thousands of federal employees across a long list of agencies. That includes nearly a dozen agencies or departments where NTEU represents bargaining-unit employees, including the Internal Revenue Service (IRS), NTEU's oldest and largest bargaining unit. NTEU has represented IRS employees since 1938.

One of the few salves after the Exclusions Order was that the IRS generally continued to honor its collective-bargaining agreement (CBA) with NTEU. This allowed NTEU to keep advocating for IRS employees and demonstrate that NTEU membership remained worthwhile.

But in February 2026, the IRS unilaterally decided to terminate the CBA. Adding insult to injury, the IRS provided no independent, reasonable justification for taking this action. After its nearly ninety-year history with NTEU, all that the IRS offered was a boilerplate termination notice that no one from the agency even wrote. Instead, the Office of Personnel Management (OPM) supplied all the language, with a few fill-in-the-blanks for agencies to complete and pass the reasoning off as their own.

The IRS's CBA termination set off a cascade of blows to NTEU. The IRS began denying rights and protections that had been provided under the CBA one after another. And it rapidly began changing conditions of employment without notifying or negotiating with NTEU. The collective effect of these actions and the relentlessness of the knocks to NTEU's standing with its IRS members have now created an emergency. The IRS's arbitrary and capricious termination of the CBA must be reversed.

# BACKGROUND

## I. Federal Sector Labor Law

In 1978, Congress enacted the Federal Service Labor-Management Relations Statute (the Statute), which governs collective bargaining for federal employees. The Statute is contained within Title VII of the Civil Service Reform Act of 1978 (CSRA) and codified as Chapter 71 of Title 5 of the U.S. Code. In the Statute, Congress expressly found that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest" and "contributes to the effective conduct of public business." 5 U.S.C. § 7101(a)(A)–(B).

The Statute guarantees employees "the right to form, join, or assist any labor organization, or to refrain from any such activity." *Id.* § 7102. It also guarantees employees the right to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." *Id.* § 7102(2).

The Statute requires agencies to "accord exclusive recognition to a labor organization" elected by secret ballot with a majority vote of the employees in a bargaining unit. *Id.* § 7111(a). Such a labor organization "is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit." *Id.* § 7114(a)(1).

## II. The NTEU-IRS CBA

NTEU began representing IRS employees in 1938. Ex. 1, Decl. of Daniel Kaspar (Nov. 10, 2026) (Kaspar Decl.) ¶ 3. After the Statute was enacted in 1978, NTEU was certified as the exclusive bargaining representative for IRS employees. *Id.* ¶ 4. NTEU has maintained a CBA with the IRS ever since. *Id.*

The most recent NTEU-IRS CBA took effect in 2022 (with a term ending October 1, 2027), as amended by a 2025 Addendum. *Id.* ¶ 5. The NTEU-IRS CBA guarantees important union and employee rights. *Id.* The CBA requires that the IRS provide NTEU advance notice of and an opportunity to bargain over changes to conditions of employment. *Id.* The CBA also has sick, family, and other kinds of leave provisions; safety and health protections; telework and alternate work schedules; labor-management relations committees to facilitate communication on workplace issues; a childcare subsidy program; a grievance procedure for resolving disputes; and protections for workers facing reductions-in-force. *Id.*

## III. The Exclusions Order

The Exclusions Order issued on March 27, 2025, exempted dozens of federal agencies and subdivisions from the Statute on the basis that such agencies had "as a primary function intelligence, counterintelligence, investigative, or national security work," and the Statute could not be "applied to" them "in a manner consistent with national security requirements and considerations." Exclusions Order. §§ 1(a), 2; *see* 5 U.S.C. § 7103(b). The Order excluded most of the Department of Treasury, including the IRS. Exclusions Order § 2(b).

Whether the Exclusions Order was a valid exercise of the President's authority is the subject of separate litigation. *See NTEU v. Trump*, *et al*., No. 25-935 (D.D.C. Mar. 31, 2025). But even if the Order validly exempted the IRS and other agencies from the Statute, the Order did not terminate CBAs on its own or require agencies to do so. *See* Exclusions Order.

## IV. OPM Guidance on the Exclusions Order

On the same day that the President issued the Exclusions Order, OPM issued guidance on the Order advising agencies to "consult with their General Counsels as to how to implement the President's directive." *See* Memorandum from Charles Ezell, OPM Acting Dir., to Heads and Acting Heads of Departments and Agencies, *Guidance on Executive Order Exclusions from*

*Federal Labor-Management Programs* (Mar. 27, 2025), https://perma.cc/H5SN-T5FZ (March 27 OPM Guidance). The following month, OPM issued "Frequently Asked Questions" (FAQs) advising agencies not to terminate any CBAs "until the conclusion of litigation or further guidance from OPM directing such termination." OPM, *Frequently Asked Questions, Executive Order 14251: "Exclusions from Federal Labor-Management Relations Programs"* (Apr. 22, 2025), https://perma.cc/38KJ-Z7TN (April 22 OPM FAQs). OPM issued updated FAQs on August 13, 2025, stating that agencies "*may choose* to terminate, abrogate, or repudiate CBAs with [non-NTEU] unions, and should consult with their General Counsels to assess next steps regarding those CBAs." OPM, *Frequently Asked Questions* (rev. Aug. 13, 2025) (emphasis added) (August 13 OPM FAQs).[1]

On February 12, 2026, OPM issued updated guidance on the Exclusions Order (that was later revised on February 17, 2026), stating that agencies "should proceed to terminate *or modify* CBAs." Memorandum from Scott Kupor, Dir., OPM, to Heads of Departments and Agencies, *Implementation of Executive Orders 14251 and 14343* at 1 (Feb. 12, 2026, rev. Feb. 17, 2026), https://perma.cc/9X9S-PXB4 (OPM's February 2026 Guidance) (emphasis added). The guidance included FAQs, which reiterated that excluded agencies should "terminate *or modify*" their CBAs. OPM, *Frequently Asked Questions* (Feb. 12, 2026, rev. Feb. 17, 2026) https://perma.cc/9ZQQ-CHWW (February 2026 OPM FAQs) (emphasis added).

OPM's February 2026 Guidance also included a template termination notice that agencies could use to inform their union counterparts of a CBA termination (OPM Template). *See* Ex. 2. The OPM template said that agencies should state that they "considered whether to

---

[1] These particular FAQs are no longer publicly available but are quoted by the government in Defendants' Letter to the Clerk at 2, *AFGE v. Trump*, No. 25-4014 (9th Cir. Aug. 14, 2025), Dkt. No. 34.1.

terminate any CBA, in whole or part." Ex. 2 at 2. OPM's template further stated that the agencies should say they "reviewed the parties' CBA to determine [whether] continuing to adhere to its provisions would be consistent with the President's national security determination." *Id.* The template said agencies should state that they "carefully review[ed] any applicable CBAs." *Id.*

## V. IRS CBA Termination

After the Exclusions Order issued, the IRS continued to follow some of the CBA's requirements. Kaspar Decl. ¶ 7. Employees were allowed to have NTEU representatives accompany them in formal meetings where discipline could result. *Id.* NTEU retained the union office space at IRS facilities that the CBA guaranteed. *Id.* And the IRS continued to process NTEU grievances. *Id.* ¶ 8. For example, the IRS responded in writing to an NTEU grievance on May 27, 2025—two months after the Exclusions Order issued. *Id.* Indeed, on September 18, 2025, the IRS advised NTEU that it had not terminated the CBA and was holding requests to bargain in abeyance pending the outcome of litigation challenging the Exclusions Order. *Id.* ¶ 9.

On February 27, 2026, however, Frank Bisignano, the IRS Chief Executive Officer, sent NTEU President Doreen Greenwald a memorandum (IRS Termination Memorandum) stating that the IRS "terminates the 2022 National Agreement and the 2025 Addendum." Ex. 3 at 1. The IRS Termination Memorandum appeared to be a near carbon copy of the OPM Template, except the IRS filled in OPM's blanks with one- or two-word agency-specific details. *Compare* Ex. 3 *with* Ex. 2. In late February and early March 2026, NTEU President Greenwald received termination memoranda from other agencies falling under the Exclusions Order's coverage, including several Department of Treasury components, that were worded almost identically. Kaspar Decl. ¶ 11.

The IRS Termination Memorandum explained that it was the IRS that determined whether and when to terminate the NTEU-IRS CBA. The memorandum stated, for example, that

after the Exclusions Order, the "Internal Revenue Service considered *whether* to terminate any CBA, in whole or part." Ex. 3 at 2 (emphasis added). The memorandum also stated that the IRS "reviewed the parties' CBA to determine [whether] continuing to adhere to its provisions would be consistent with the President's national security determinations." *Id.* It stated that the "Internal Revenue Service has determined that continued adherence to the parties' CBA is detrimental to the agency's national security mission." *Id*. at 3.

The IRS Termination Memorandum included four examples of how the CBA allegedly bears on the agency's national-security mission. These four examples mimic the four generic examples in the OPM Template.

For example, one national-security explanation in the IRS Termination Memorandum states:

> Article 40 creates a procedural impediment to quickly separating poor performers beyond those required by statue or regulation. Article 40 requires a Performance Improvement Period (PIP) of never less than 60 days, as opposed to the 30 calendar days required by the Office of Personnel Management.

Ex. 3 at 2. This parrots one of the national-security explanations in the OPM Template, which states:

> [Insert CBA provision] creates a procedural impediment to quickly separating poor performers beyond those required by statute or regulation. [Insert description of added procedures or time (e.g., informal PIPs) beyond those required under law or regulation].

Ex. 2 at 2. The IRS Termination Memorandum also mimics the single paragraph on reliance interests in the OPM Template. The IRS Termination Memorandum states:

> The Department of the Treasury, Internal Revenue Service, also considered the interests of bargaining unit employees and the National Treasury Employees Union in continuing to adhere to the parties' CBA. The Department of the Treasury, Internal Revenue Service understands that bargaining unit employees and the National Treasury Employees Union structured certain expectations surrounding the existence of the parties' CBA, including work schedules, leave procedures,

> performance management, and other conditions of employment. In evaluating the effect of terminating the CBA, the Department of the Treasury, Internal Revenue Service agency reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures.

Ex. 3 at 3. The OPM Template stated:

> [Insert agency name] also considered the interests of bargaining unit employees and the [insert name of certified representative] in continuing to adhere to the parties' CBA. [Insert agency name] understands that bargaining unit employees and the [insert name of certified representative] structured certain expectations surrounding the existence of the parties' CBA, including work schedules, leave procedures, performance management, and other conditions of employment. In evaluating the effect of terminating the CBA, the agency reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures.

Ex. 2 at 3. The IRS Termination Memorandum's paragraph on reliance interests is *identical* to the OPM Template except for the insertion of the parties' names.

The IRS Termination Memorandum identifies a few discrete, alleged problems with the NTEU-IRS CBA, such as the cost of official time. Ex. 3 at 2. But the IRS does not explain why it elected to terminate the CBA in its entirety instead of only terminating the allegedly problematic sections.

## VI. Harm to NTEU

Following the CBA termination in February 2026, the IRS quickly began denying rights and protections that had been provided under the CBA. Kaspar Decl. ¶ 12. It evicted NTEU from its office space at IRS facilities. *Id.* It canceled labor-management relations committee meetings and refused to engage in the negotiated grievance procedure. *Id.* And it rapidly began changing conditions of employment without notifying or negotiating with NTEU. *Id.* ¶ 13. For example, it canceled alternative work schedules; changed processes for seeking reasonable accommodations for medical issues; forced involuntary relocations and details on employees; changed how it evaluates employees' performance; altered how it allocates overtime shifts to employees; and

suspended programs through which employees could request advancements of sick or annual leave. *Id.*

Each of the IRS's changes on its own might not seem disastrous. But the cumulative effect casts NTEU as less and less relevant in IRS workplaces. *See id.* ¶¶ 16–19. NTEU's diminished standing in the eyes of its members became especially clear two months ago. *See id.* ¶ 17. Because the federal government's payroll-provider agencies stopped withholding union dues from employees' paychecks after the Exclusions Order, NTEU built a system allowing members to pay their voluntary dues to NTEU directly. *Id.* NTEU set a deadline of September 5, 2026, by which members needed to enroll in the direct payment system to retain their NTEU membership. *Id.* When that deadline passed, enrollment numbers showed that thousands of employees decided that NTEU membership was no longer worth paying dues. *Id.*

And the blows keep coming. On October 21, 2026, the IRS announced changes to procedures for requesting leave under the Family Medical Leave Act (FMLA). *Id.* ¶ 14. Whereas the CBA ensured that employees would not be required to reveal the details of their medical condition to their supervisors or managers, the IRS's new procedures require just that. *Id.* The IRS also just recently canceled the childcare subsidy program that was guaranteed under the CBA. *Id.* ¶ 15.

The struggle to retain relevance in IRS workplaces has reached the point of emergency. *See id.* ¶ 19. NTEU filed its Complaint on October 28, 2026, challenging the IRS's CBA termination as arbitrary and capricious under the Administrative Procedures Act (APA). Because recent events that have resulted from the CBA termination promise to destroy NTEU's ability to advocate for the IRS employees that it has represented since 1938 and eliminate those employees' reasons to remain NTEU members, NTEU now moves for a preliminary injunction.

# ARGUMENT

Other unions have challenged agencies' CBA terminations and obtained preliminary injunctions, including in this circuit. *AFGE Loc. 2305 v. U.S. Dep't of Veterans Affs.,* No. 25-cv-583*,* 2026 U.S. Dist. LEXIS 52266, at *34 (D.R.I. Mar. 13, 2026) (granting preliminary injunction), *stay granted in part and denied in part*, 177 F.4th 1, 13 (1st Cir. 2026); *Nat'l Council of Prison Locs. v. Fed. Bur. of Prisons*, No. 3:25-CV-1907, 2026 U.S. Dist. LEXIS 222823, at *39 (D.Conn. Sept. 29, 2026). "To secure a preliminary injunction, the moving party must establish 'that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *New York v. Trump*, 171 F.4th 1, 15 (1st Cir. 2026) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008)). NTEU demonstrates that it satisfies these factors below.

## I. NTEU Is Likely to Succeed on the Merits.

### A. The IRS's CBA Termination Is a Final, Reviewable Agency Action.

**1.** Under the APA, "final agency action" is "subject to judicial review." 5 U.S.C. § 704. The IRS is an agency subject to the APA. 5 U.S.C. § 701(a)(2), (b)(1). And its termination of the CBA with NTEU was a "final" action under the Supreme Court's definition.

The Supreme Court's definition of "final agency action" has two parts. "First, the action must mark the 'consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948)). That is, the action "must not be of a merely tentative or interlocutory nature." *Id.* at 178. "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

The IRS's CBA termination easily meets these criteria. The statement at the end of the IRS Termination Memorandum that "the parties' 2022 National Agreement and the 2025 Addendum to the 2022 National Agreement *are terminated and no longer in effect*" is far from tentative. Ex. 3 at 4 (emphasis added). No further steps need to be taken to consummate the IRS's decisionmaking process. In addition, the IRS's CBA termination consequentially altered rights and obligations. For example, NTEU lost its right, which was memorialized in the CBA, to maintain a union office at IRS facilities. Kaspar Decl. ¶ 12. IRS employees similarly lost CBA-guaranteed rights such as childcare subsidies and flexible work schedules. *Id.* ¶¶ 13, 15.

**2.** In another case challenging a CBA termination, the government argued that the termination was not a reviewable agency action because either the agency lacked any decision-making discretion, or it had unfettered, unreviewable discretion. *Nat'l Council of Prison Locs.*, 2026 U.S. Dist. LEXIS 222823, at *25–31. The U.S. District Court for the District of Connecticut rejected both alternatives. Similar reasoning applies here.

**a.** As the court held in *National Council of Prison Locals*, the decision whether to terminate the CBA, and to what extent, belonged to the agency—it was not required by the President in the Exclusions Order or by OPM. *See id.* at 25–28. The Exclusions Order itself did not terminate CBAs or require agencies to do so. Nor did OPM's guidance that was issued the same day. Instead, OPM advised agencies to "consult with their General Counsels as to how to implement the President's directive." *See* March 27 OPM Guidance.

Further showing that the Exclusions Order did not require agencies to terminate CBAs, OPM's April 2025 FAQs advised agencies *not to terminate* any CBAs "until the conclusion of litigation or further guidance from OPM directing such termination." April 22 OPM FAQs. Then, when OPM updated its FAQs on August 13, 2025, it used the discretion-connoting language that

agencies "*may choose* to terminate, abrogate, or repudiate CBAs with [non-NTEU] unions, and should consult with their General Counsels to assess next steps regarding those CBAs." August 13 OPM FAQs (emphasis added).

If more evidence were needed that the CBA termination did not follow necessarily from the Exclusions Order, the Administration's position in litigation over the Exclusions Order supplies it. The day after the Exclusions Order issued, the Department of Treasury sued NTEU in the Eastern District of Kentucky seeking a declaration that the agency was "authorized to terminate its CBAs pursuant to the Executive Order and OPM's implementing guidance." *See* Compl., Request for Relief, *U.S. Dep't of Treas. v. NTEU Ch. 73*, No. 25-cv-49, Dkt. No. 1. The complaint asserted that "[b]ecause the IRS has been properly excluded from coverage under 5 U.S.C. Chapter 71, Plaintiff is free to rescind or repudiate CBAs that Defendant implements and enforces." *Id.* ¶ 64. By asking the court to "[d]eclare that Plaintiff is authorized to terminate its CBAs pursuant to the Executive Order and OPM's implementing guidance" *id.*, Request for Relief, the complaint shows that the Administration believed that it could not terminate CBAs absent a court order.[2]

Finally, even OPM's February 2026 Guidance did not require agencies to terminate CBAs. It stated that agencies "should proceed to terminate *or modify* CBAs." OPM's February 2026 Guidance (emphasis added). The FAQs accompanying the guidance reiterated that agencies could choose to "terminate *or modify*" their CBAs. February 2026 OPM FAQs at 1(emphasis added). The OPM Template issued with the guidance further suggested that agencies should "consider[] whether to terminate any CBA, in whole or part." Ex. 2 at 2.

---

[2] The court never issued an order declaring that the IRS was authorized to terminate its CBA. The case was dismissed for lack of standing. *U.S. Dep't of Treasury v. NTEU Ch. 73*, 783 F. Supp. 3d 991, 1016 (E.D. Ky. 2025).

So, when the IRS terminated its CBA, it was not merely following the President's or OPM's mandate. It exercised its own decision-making discretion in choosing to terminate, rather than simply modify, the CBA.

**b.** While the IRS exercised discretion when it chose to terminate the CBA, that decision was not "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). As the court observed in *National Council of Prison Locals*, there is a "strong presumption that Congress intends judicial review of administrative action" under the APA. *Nat'l Council of Prison Locs.*, 2026 U.S. Dist. LEXIS 222823, at *28 (quoting *Cnty. of Westchester v. HUD*, 778 F.3d 412, 418-19 (2d Cir. 2015)); *see also Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 170 (1st Cir. 2021). "[T]o honor the presumption of judicial review," the Supreme Court has "read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dep't of Comm. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). Examples include "a decision not to institute enforcement proceedings or a decision by an intelligence agency to terminate an employee," which the agency could do whenever the agency head "deemed it advisable." *Id.* (citation modified).

Here, as in *National Council of Prison Locals*, "[t]here is no indication that a decision to terminate an agreement such as the CBA is an action solely committed to an agency's discretion by law under § 701 (a)(2)." *Nat'l Council of Prison Locs.*, 2026 U.S. Dist. LEXIS 222823, at *29. A CBA termination does not resemble the traditional examples of actions committed to agency discretion. Rather, this case more resembles the Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), which

involved an agency's decision to eliminate a program offering benefits. *See Nat'l Council of Prison Locs.*, 2026 U.S. Dist. LEXIS 222823, at *29–30. The Court there held that the agency's decision was not committed to agency discretion by law because it "'provides a focus for judicial review,' and because ensuring 'access to these types of benefits is an interest courts often are called upon to protect.'" *Id.* at 30 (quoting *Dep't of Homeland Sec.*, 591 U.S. at 18–19). The same is true here: "ensuring employment agreements are upheld and employees retain access to their agreed-upon benefits are interests courts are often called upon to protect." *Id.*

So, the CBA termination was a final action by the IRS, not the President or OPM. And it was not committed to agency discretion by law. The CBA termination thus constitutes final, reviewable agency action under the APA.

**B. The IRS's CBA Termination Was Arbitrary and Capricious.**

Final agency actions must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U. S. 414, 423 (2021)). When an agency changes course, "serious reliance interests . . . must be taken into account.'" *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Moreover, "when an agency rescinds a prior policy its reasoned analysis must consider the alternative[s] that are within the ambit of the existing [policy]." *Dep't of Homeland Sec.*, 591 U.S. at 30 (citation modified). The IRS's termination is arbitrary and capricious because the agency failed to engage in reasoned decisionmaking, failed to consider reliance interests, and failed to consider obvious alternatives.

**1. The IRS's Mere Duplication of OPM's Boilerplate Termination Notice Does Not Constitute Reasoned Decisionmaking.**

Although the arbitrary and capricious standard is deferential, courts "cannot defer to an explanation that consists of nothing more than boilerplate *ipse dixit* that could be cut and pasted into all manner of [agency] decisions indiscriminately." *Thrivent Fin. for Lutherans v. SEC*, 183 F.4th 777, 784 (D.C. Cir. 2026); *see also Amerijet Int'l Inc. v. Pistole*, 753 F.3d 1343, 1352 (D.C. Cir. 2014) (stating that "programmatic boilerplate" is not a "reasoned explanation"); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (finding that boilerplate letters "omitted the critical step—connecting the facts to the conclusion"); *Whitehouse v. Raytheon Co.*, 672 F. Supp. 2d 174, 180 (D. Mass. 2009) (finding an explanation that "merely copied and pasted its reasoning" from a prior letter was arbitrary and capricious). Here, the IRS Termination Memorandum is nothing more than the cut-and-pasted boilerplate that courts have deemed unreasonable.

Except for filling in a few blanks as if playing MadLibs, the IRS Termination Memorandum borrows its language from the OPM Template verbatim. *Compare* Ex. 2 *with* Ex. 3. Such wholesale duplication casts doubt on whether the IRS independently considered the factors that OPM proposed or, more egregiously, whether it read the language it copied at all. In fact, the IRS even reproduced a typographical error from the OPM Template. The OPM Template says, "[Insert agency name] reviewed the parties' CBA to determine continuing to adhere to its provisions would be consistent with the President's national security determination." Ex. 2 at 2. This sentence is missing the word "whether" in the phrase "to determine [whether] continuing to adhere to its provisions." The IRS Termination Memorandum contains the same omission. Ex. 3 at 2. A reasonable agency that read the template or proofread its own memorandum likely would have caught and corrected that typo.

Even where the OPM Template invites agencies to come up with their own examples of CBA provisions that interfere with their national-security missions, the IRS declines and copies OPM's prefabricated examples instead. One example from the OPM Template reads as follows:

> [Insert CBA provision] establishes a grievance-arbitration process that prevents the agency from quickly disciplining or removing employees for poor performance or misconduct detrimental to the national security mission of the agency and the efficiency of the service. In some circumstances, arbitrators have restored employees to their former positions despite evidence of their detrimental performance or conduct impacting the agency's mission. [insert examples, as applicable].

Ex. 2 at 2. In adopting this example, all the IRS did was insert the provision of the NTEU-IRS CBA that sets forth the grievance arbitration process:

> Article 43 establishes a grievance-arbitration process that prevents the IRS from quickly disciplining or removing employees for poor performance or misconduct detrimental to the national security mission of the Department of the Treasury, IRS and the efficiency of the service. In some circumstances, arbitrators have restored employees to their former positions despite evidence of their detrimental performance or conduct impacting the Department of the Treasury, IRS's mission.

Ex. 3 at 2. In taking this copy-and-paste approach, the IRS did not engage in any independent reasoning about whether or how the grievance-arbitration process actually interferes with national security at the IRS, as opposed to any other agency for whom OPM drafted the template. Without an IRS-specific analysis, the IRS could not have "considered the relevant factors" in deciding whether to terminate or modify the CBA. *Hist. Bridge Found. v. Buttigieg*, 22 F.4th 275, 282 (1st Cir. 2022) (quoting *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 202 (1st Cir. 1999)).

When the IRS has merely regurgitated OPM's language—typos and all—with nominal contributions of its own, the Court cannot "ensure that" the IRS's CBA termination was "founded on a reasoned evaluation of the relevant factors." *Id.* The IRS's CBA termination is thus arbitrary and capricious and must be set aside.

### 2. The IRS Failed to Consider NTEU's and Its Members' Reliance Interests.

When an agency is "not writing on a blank slate," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 591 U.S. at 33 (citation modified). The IRS failed to give due consideration to NTEU's and its members' reliance interests here.

The OPM Template pays only lip service to employees' and union's reliance interests. It states, "[Insert agency name] understands that bargaining unit employees and the [insert name of certified representative] structured certain expectations surrounding the existence of the parties' CBA." Ex. 2 at 3. And it concludes that upending these expectations is fine because "existing legal and policy frameworks provide a sufficient backstop." *Id.* The IRS adopts this curt assessment of reliance interests, just as it adopts the rest of OPM's language. Ex. 3 at 3.

The consideration of reliance interests here, however, is one part of the agency's decisionmaking that is particularly unsuited to a one-size-fits-all template. NTEU has represented IRS employees for ninety years and maintained a CBA with the IRS for forty. *See* Kaspar Decl. ¶¶ 3, 4. Yet its reliance interests are treated with the same dismissiveness as those of any other federal union, regardless of how long its collective-bargaining relationship was with the relevant agency.

Moreover, the IRS's behavior since terminating the CBA shows that "existing legal and policy frameworks" were foreseeably inadequate to provide a "sufficient backstop." For instance, since terminating the CBA, the IRS has forced involuntary relocations and details on employees, changed how it allocates overtime shifts to them in unfair and arbitrary ways, and canceled all pending requests for advancements of sick of annual leave. Kaspar Decl. ¶ 13. Without the constraints of the CBA, "existing legal and policy frameworks" have allowed the IRS to abruptly rescind benefits on which employees rely, with no meaningful checks.

So, in adopting OPM's template dismissal of reliance interests, the IRS ignored NTEU's unique interests as the especially longstanding bargaining representative. And it allowed foreseeable injustices to befall its employees. These failures are arbitrary and capricious.

**3. The IRS Failed to Consider Alternatives to Immediate Termination.**

To pass muster under the APA, an agency "must consider and explain its rejection of . . . significant and viable and obvious alternatives" to the decision it chose. *Massachusetts v. Dep't of Educ.*, 828 F. Supp. 3d 198, 216 (D. Mass. 2026) (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)). The IRS failed to do so here.

OPM's guidance made clear that the IRS could choose to "terminate *or modify*" the CBA. OPM's February 2026 Guidance (emphasis added). The IRS Termination Memorandum provides no evidence that the IRS considered the alternative of modifying the CBA by, for example, only adhering to provisions with no impact on national security.

Even if the IRS reasonably considered and rejected modification, the decision to terminate comes with alternatives as to when the termination should take effect. When the parties executed the 2022 CBA, for instance, they agreed that it would expire on October 1, 2027. Kaspar Decl. ¶ 5. The IRS could have decided to terminate the CBA at this agreed-upon time, rather than making termination effective immediately. Indeed, that approach would have been much more reasonable given NTEU's entrenched reliance interests.

Thus, the IRS failed to adequately consider obvious alternatives, on top of neglecting to perform its own independent reasoning and ignoring the reliance interests that the CBA has engendered for decades. The IRS's CBA termination was arbitrary and capricious and must be set aside under the APA.

## II. NTEU Will Suffer Irreparable Harm Without Preliminary Relief.

Since the termination, the IRS has rejected or refused to respond to NTEU's requests to bargain over working conditions. Kaspar Decl. ¶ 12. It has refused to participate in the grievance-arbitration process designed to resolve workplace disputes. *Id.* It has denied NTEU its right to attend meetings with NTEU members at the IRS that might lead to discipline or that are otherwise investigatory in nature. *Id.* It has refused to honor the childcare subsidy program that NTEU negotiated. *Id.* ¶ 15. And, more recently, the IRS has rapidly changed workplace policies on a host of issues without notice to or bargaining with NTEU, purposefully creating the impression among NTEU members that their union is gone. *Id.* ¶ 13.

These actions irreparably harm NTEU's influence and standing among its IRS members. NTEU is missing opportunities to fight for its workers that it will never get back. *Id.* ¶ 16. And its members are canceling their membership as a result. *Id.* ¶ 17, ¶ 19.

Courts have long recognized the non-theoretical, commonsense reality that "[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining," making after-the-fact remedies insufficient. *See Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). That is especially so when a union is deprived of its collective-bargaining power at a time when its workers need it the most.

In the current climate, NTEU's IRS members are looking to their union for support, which makes the IRS's termination of its CBA with NTEU even more likely to have lasting, harmful effects. Kaspar Decl. ¶ 18. As the Director of the Office of Management and Budget has explained:

> We want the bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains. . . . We want to put them in trauma.

William Wan & Hannah Natanson*, White House Officials Wanted To Put Federal Workers 'In Trauma.' It's Working*., Wash. Post (May 20, 2025), www.washingtonpost.com/ investigations/2025/05/20/ federal-workers-trump-mental-health/.

Especially in this environment, when the IRS refuses to acknowledge its collective-bargaining agreement with NTEU or refuses to progress a grievance alleging discrimination or harassment, the affected workers and their fellow union members will question why they should belong to NTEU at all. Kaspar Decl. ¶ 18. And NTEU will be diminished in a way that cannot be undone.

As another judge in this Circuit has explained:

> [T]here are benefits from [a] CBA the loss of which cannot be adequately rectified later if the Plaintiffs ultimately prevail in this case. Disciplinary processes, once concluded, have an immediate and irreparable effect on the employee(s) in question. Parents cannot turn back the clock to have more time with an infant prior to returning to work once they have missed the early formative weeks of development and their own recovery time.

*AFGE Loc. 2305*, 2026 U.S. Dist. LEXIS 52266, at *31 (granting preliminary relief against federal agency CBA termination). So too here.

Without preliminary relief, there is a "very real danger" that NTEU's membership will continue to "erode" and that any final remedy "would be ineffective." *See Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990). *See also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191-92 (9th Cir. 2011) (holding that an employer's refusal to engage in collective bargaining was irreparable injury because "a delay in bargaining weakens support for the union" that cannot be remedied later). That danger is not speculative here, where NTEU has

already lost tens of thousands of members at the IRS since the termination of its CBA. Kaspar Decl. ¶ 19.[3]

### III. The Balance of Equities Tips in NTEU's Favor, and Preliminary Relief Will Serve the Public Interest.

The last two preliminary injunction factors "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). The public interest favors NTEU. Congress has already stated that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest [and] contributes to the effective conduct of public business." 5 U.S.C. § 7101(a)(1). And the equities likewise favor NTEU, which merely seeks to restore the status quo as it existed for decades. The IRS will not be harmed by honoring an agreement that it freely negotiated and agreed to.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff NTEU requests that this Court grant the preliminary injunctive relief set out in its proposed order.

---

[3] While some time has passed since the IRS's notice of termination, the cumulative effects of that termination are now being realized. Kaspar Decl. ¶ 19. And this passage of time, in any event, is immaterial to the request for emergency relief. *AFGE Loc. 2305*, 2026 U.S. Dist. LEXIS 52266, at *30 n.10 (relying on *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 16 (1st Cir. 2012)).

Respectfully submitted,

*/s/ Paras N. Shah*
PARAS N. SHAH
General Counsel
Mass. Bar No. 669423

*/s/ Allison C. Giles*
ALLISON C. GILES*
Associate General Counsel

*/s/ Jessica Horne*
JESSICA HORNE*
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

November 13, 2026

Counsel for Plaintiffs
* Pro hac vice applications forthcoming

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a)(2) of the United States District Court for the District of Massachusetts, I hereby certify that

- Service of the complaint in this case was effectuated on the U.S. Attorney's Office (USAO) for the District of Massachusetts on November 3, 2026 (Dkt. #4), but no attorney for defendant has yet entered an appearance.
- On Monday, November 9, 2026, I called the USAO in Boston and left a detailed voice mail message, including that plaintiffs intended to move for a preliminary injunction this week.
- Having not received a return phone call, I called the USAO in Boston again on Tuesday, November 10, 2026, and again left a detailed voice mail message. Rayford A. Farquhar, Deputy Chief of the Civil Division, returned my phone call later that day, and we spoke at approximately 3:30 p.m. Pursuant to Mr. Farquhar's request, I emailed him a copy of the complaint in this case that afternoon. I explained in the phone conversation and in the email I sent Mr. Farquhar that plaintiffs would be moving for a preliminary injunction on Friday, November 13, 2026.
- I emailed Mr. Farquhar again on Thursday, November 12, 2026 (although delivery of this email may have been delayed because of the Outlook breakdown), to reiterate that we would be moving for a preliminary injunction on Friday, November 13, 2026, and asked whether he or assigned counsel wished to discuss that motion. I have not received a response to that query.

Respectfully submitted,

*/s/ Allison C. Giles*

ALLISON C. GILES*
Associate General Counsel
NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
allie.giles@nteu.org
* Pro Hac Vice application forthcoming

November 13, 2026